UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Karen A. Przybilla,                          Civ. No. 10-1141 (SRN/JJK)

        Plaintiff,

v.                                           **REPORT AND RECOMMENDATION**

Michael J. Astrue,
Commissioner of Social
Security,

        Defendant.

---

Peter Vogel, Esq., counsel for Plaintiff.

Lonnie F. Bryan, Esq., Assistant United States Attorney, counsel for Defendant.

---

JEFFREY J. KEYES, United States Magistrate Judge

Pursuant to 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner"), who denied Plaintiff's applications for disability-insurance-benefits and supplemental-security income.  The parties have filed cross-motions for summary judgment. (Doc. Nos. 7, 9.)  This matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1.  For the reasons stated below, this Court recommends that Plaintiff's motion be denied and that Defendant's motion be granted.

This is one of many difficult disability-insurance-benefits cases in which a claimant who suffers from a long history of alcohol abuse, as well as multiple other physical and mental difficulties, is denied coverage because alcohol abuse is a "contributing factor material to [her] disab[ility]."  42 U.S.C. § 423(d)(2)(C). This arises from the fact that in 1996 Congress set new standards of eligibility for claimants who fell into the "DA&A" category, that is "Drug Users and Alcoholics." Members of Congress believed that payments of benefits to addicts "inappropriately divert scarce federal resources from severely disabled individuals" and "provide a perverse incentive, contrary to the long-term interest of addicts and alcoholics, by providing them with cash payments so long as they do not work."  Interim Report by the Lewin Group, Inc., Policy Evaluation of the Effect of Legislation Prohibiting the Payment of Disability Benefits to Individuals Whose Disability is Based on Drug Addiction and Alcoholism, at I-3 (April 28, 1998) (citing Senate Comm. on Finance, Report on the Family Self-Sufficiency Act Of 1995, 104-96 (1995)).  As a result, Congress sought to remove the "perverse incentives" by enacting the Contract with America Advancement Act of 1996, Pub. L. No. 104-121, which eliminated Medicare/Medicaid coverage for those whose drug or alcohol addiction was such a contributing factor material to their disability.

Essentially, the standard for eligibility since 1996 asks whether the claimant would still be disabled, due to other impairments, if he or she stopped consuming drugs or alcohol.  In practice, this standard functions as a "but for"

test: if the applicant's disability would exist but for continuing substance abuse, then the claim is denied. This presents claim adjudicators with the extremely difficult task of sorting out, often in a highly speculative endeavor, the relationship between the claimant's addiction and the claimant's often many other intertwined disorders such as depression, bi-polar disorder, anxiety, schizoid behavior, and physical ailments. And it often places a virtually insurmountable burden on the claimant who bears the burden of proving that her DA&A is not a contributing factor to the disability. *See Middlestedt v. Apfel*, 204 F.3d 847 (8th Cir. 2000) (holding that a claimant with a heart condition and seizures who failed to show that alcohol was not a material factor, thus, was not disabled).

Plaintiff in this case presents just such a compelling history of a life marked by long-term alcohol abuse, affective disorder, and dependent personality disorder, among other medical complications. But Congress has prohibited the payment of benefits to individuals who would not be disabled if they were to cease abusing alcohol, and this Court's review here is limited to whether there is substantial evidence to support the agency's decision denying Plaintiff's claim on this basis, not whether this Court would have made the same decision on this record. And here, as explained in detail below, there was competent medical evidence that if Plaintiff stopped abusing alcohol she would have the residual functional capacity to work at available jobs. Thus, this Court must recommend that Defendant's motion be granted and Plaintiff's motion be denied.

## BACKGROUND

### I.    Procedural History

Plaintiff filed her present applications for disability insurance benefits and

supplemental security income on October 9 and 10, 2006, alleging a disability

onset date of July 13, 2006.  (Tr. 109-114, 115-120.)[1]  The applications were

denied initially and on reconsideration.  (Tr. 59-63, 67-72.)  Plaintiff timely

requested a hearing, which was held before an Administrative Law Judge ("ALJ")

on November 5, 2008.  (Tr. 73, 19-52.)  On February 6, 2009, the ALJ issued an

unfavorable decision.  (Tr. 7-18.)  Plaintiff sought review of the ALJ's decision,

but the Appeals Council denied the request for review on February 24, 2010.

(Tr. 1-4.)  The denial of review made the ALJ's decision the final decision of the

Commissioner.  *See* 42 U.S.C. § 405(g); *Clay v. Barnhart*, 417 F.3d 922, 928 (8th

Cir. 2005); *Browning v. Sullivan*, 958 F.2d 817, 822 (8th Cir. 1992).

On April 6, 2010, Plaintiff filed the instant action with this Court seeking

judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).  The parties then

filed cross-motions for summary judgment.  *See* D. Minn. Loc. R. 7.2.

### II.   Statement of Facts

Plaintiff was born on November 17, 1965.  (Tr. 109.)  At the time of her

alleged onset of disability on July 13, 2006, she was 40-years-old.  Plaintiff has a

high school education.  (Tr. 184.)  She has past relevant work as a production

---

[1]    Throughout this Opinion, reference to the administrative transcript for the present case, Civ. No. 10-1141 (SRN/JJK), is made by using the abbreviation "Tr."

line assembler (light exertional and semi-skilled work); sandwich maker (medium exertional and unskilled work); mailing machine operator (medium exertional and skilled work); and night staff (light exertional and semi-skilled work).  (Tr. 222.) Plaintiff alleged that major depression, mental illness and hearing loss limit her ability to work.  (Tr. 177.)

### A.   Medical Records

The first medical record is from December 20, 1983, when Plaintiff was 18-years-old.  (Tr. 229.)  She saw Dr. Thomas Belfiori at Northern Pines Mental Health Center for medication management.  (*Id.*)  Plaintiff reported that she was put on Lithium while hospitalized in the CD (chemical dependence) unit in January and February of that year.  (*Id.*)  Plaintiff had mood problems that ranged during a single day from being sad to somewhat hyper.  (*Id.*)  Plaintiff's family history included depression, suicide, mental illness, and drinking problems.  (*Id.*) Dr. Belfiori advised she should not be on Lithium if she was still drinking.  (Tr. 230.)

The next medical record is fifteen years later.  In therapy at Northern Pines Mental Health Center on November 19, 1998, Plaintiff discussed difficulties in her marriage.  (Tr. 228.)  Licensed psychologist Karleen Schmiedt ("Schmiedt") noted that Plaintiff remained sober and attended AA and CD treatment.  (*Id.*)

In counseling on March 1, 1999, Plaintiff reported she was going to leave her husband and move in with a friend.  (Tr. 227.)  Schmiedt noted that Plaintiff's family had a significant history of depression and suicide, which put Plaintiff at

risk.  (*Id.*)  Plaintiff reported some flare-up of depression but denied feeling

suicidal.  (*Id.*)  Schmiedt noted Plaintiff was taking her medication, and Plaintiff

admitted to drinking.  (*Id.*)

Six years later, Plaintiff underwent a diagnostic assessment with Schmiedt

on August 23 and September 14, 2005.  (Tr. 266-68.)  Plaintiff reported she

would be on house arrest for the month of September every year for five years,

as a result of her fourth DWI in 2004.  (Tr. 266.)  She went to jail for felony DWI

from January through April 2005.  (*Id.*)  She would have one year of sobriety on

October 10, 2005.  (*Id.*)  Plaintiff was living with her brother but would be looking

for new housing after her house arrest.  (*Id.*)  She was attending AA meetings

and getting treatment at the Effective Living Center.  (*Id.*)  Schmiedt diagnosed

recurrent and severe major depression, alcohol dependency, anxiety "nos" (not

otherwise specified), dependent personality disorder, and a GAF score of 60.[2]

(Tr. 267.)

Next year, on May 17, 2006, Plaintiff and her social worker went to see Dr.

Heidi Gunn at Family Medical Center for help with Plaintiff's increased

depression.  (Tr. 248.)  Plaintiff had been off her antidepressant for three weeks

because she could no longer afford it.  (Tr. 248.)  Dr. Gunn noted that she would

---

[2]      A GAF score is used to report the clinician's judgment of the individual's
overall level of functioning.   *Diagnostic and Statistical Manual of Mental
Disorders* 32 ("DSM-IV-TR") (American Psychiatric Association 4th ed. text
revision 2000).   GAF scores between 51-60 indicate moderate symptoms or
moderate difficulty in social, occupational or school functioning.  *Id.* at 34.

try to help Plaintiff with this, and with disability.  (*Id.*)  Plaintiff appeared very flat and depressed.  (*Id.*)  Dr. Gunn diagnosed severe depression, and she increased Plaintiff's medication and told her to apply for a free drug program.  (*Id.*)

Plaintiff went to the Family Medical Center on June 28, 2006, to follow up regarding her anxiety and depression.  (Tr. 247.)  Plaintiff complained of feeling jittery in the morning after taking Effexor, and she was not sleeping well.  (*Id.*) She reported that she was attending AA meetings but had used alcohol to excess twice since her last visit.  (*Id.*)  She reported hearing voices and seeing shadows, which made her drink.  (*Id.*)  Dr. Gunn noted Plaintiff was quite anxious and paranoid at times, but she maintained her full-time job, which did not offer insurance for mental health.  (*Id.*)  On examination, she looked anxious and barely made eye contact.  (*Id.*)  Dr. Gunn opined Plaintiff badly needed a full psychiatric evaluation.  (*Id.*)  She diagnosed "depression with likely schizoaffective disorder or similar."  (*Id.*)

On July 3, 2006, Dr. Gunn wrote a letter to the Morrison County Department of Human Services regarding her treatment of Plaintiff beginning in 1991.  (Tr. 256-57.)  Dr. Gunn stated that:

> She has symptoms of severe depression with paranoid delusions. She also hears voices and sees shadows.  In the past she has had diagnosis of major depression, recurrent moderate anxiety disorder and alcohol dependency.  On Axis II, she had dependent personality disorder.  She is functioning at 55 to 60 g.f. and has financial and legal stressors.  However, I believe that there is evidence now that she may have depression with paranoid features or something like schizoaffective disorder.  However, she needs a full psychiatric evaluation and can not get that done until she has medical coverage

> . . . She is extremely vulnerable at this point and she may have to
> quit her job in order to qualify for the care that she needs.

(Tr. 256.)  She also noted that Plaintiff complied with her medication, and her depression was severe and under poor control.  (Tr. 257.)  She added that Plaintiff was willing "to go through chemical dependency issues" because she tends to use alcohol to mask the symptoms of hearing voices and seeing shadows.  (*Id.*)

On August 2, 2006, nurse Lynda Carner and psychologist Theresa Brown at Northern Pines Mental Health Center completed a Functional Assessment form regarding Plaintiff.  (Tr. 343-44.)  They rated Plaintiff as having moderate problems in the following areas:  mental health symptoms, mental health service needs, use of drugs or alcohol, vocational functioning, social functioning including use of leisure time, interpersonal functioning including relationships with the adult's family, self-care and independent living capacity.  (*Id.*)  They rated Plaintiff to have a slight problem in the following areas:  using transportation, obtaining and maintaining housing, dental health, medical health, and educational functioning.  (*Id.*)  They rated Plaintiff to have a severe problem in obtaining financial assistance.  (Tr. 342.)

Nurse Carner wrote a Case Closing Summary regarding her treatment of Plaintiff on August 3, 2006.  (Tr. 340-42.)  She opined that Plaintiff's prognosis was good if she followed through with treatment and maintained sobriety.  (Tr. 340.)

In therapy on August 9, 2006, Plaintiff wanted to rule out bipolar disorder, which she had been diagnosed with in the past few years.  (Tr. 265.)  Schmiedt noted that Plaintiff relapsed with alcohol in June, and she was laid off her factory job.  (*Id.*)  She moved in with a roommate who was also in AA.  (*Id.*)

Plaintiff's symptoms were depression, low energy, and anxiety; the latter of which she felt triggered her relapses.  (*Id.*)  Schmiedt's assessment of Plaintiff's functioning was "depressed, anxious, not suicidal at this time.  GAF: 50."[3]

Plaintiff underwent a neuropsychological evaluation with Dr. Jeffrey Kearney at St. Cloud Neurobehavioral Associates in August 2006.  (Tr. 233-38.)  Dr. Kearney noted that Plaintiff was sent to a rural chemical dependency program at age fifteen, but she escaped two weeks later.  (Tr. 233.)  She was married at age 19.  (*Id.*)  Her husband was abusive, and Plaintiff drank excessively.  (*Id.*)  They divorced after four years.  (*Id.*)

Plaintiff reported that her second husband was also abusive, and they divorced four years ago.  (Tr. 234.)  Plaintiff was currently living with a friend from AA.  (*Id.*)  She was laid off her manufacturing job in mid-July 2006.  (*Id.*)  She had a history of DWIs, the most recent being in April 2004.  (*Id.*)

Plaintiff reported that she had bilateral hearing loss, left greater than the right.  (*Id.*)  She had hearing aids but did not wear them.  (*Id.*)  She had two prior psychiatric hospitalizations, one at age 17, and one in 1996 for depression and

---

[3]     A GAF score of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  DSM-IV-TR at 34.

suicidal thoughts.  (*Id.*)  Plaintiff was in six chemical dependency treatment programs but completed only four of them.  (*Id.*)  She completed the most recent program in July 2005.  (*Id.*)  She had been sober for two months at the time of the evaluation.  (*Id.*)  She attended AA three times a week.  (*Id.*)  Her medications were Effexor and Risperdal.  (*Id.*)

Plaintiff reported symptoms of poor recent and remote memory and difficulty with attention and concentration.  (*Id.*)  She had some anxiety-related tremors and daily headaches.  (*Id.*)  She was independent in self-care and daily living skills including cooking and cleaning.  (Tr. 235.)  She was receiving unemployment benefits, and would be under house arrest for one month beginning September 1, due to her DWI.  (*Id.*)

Plaintiff reported that she was in a good mood when she went to AA, but if she did not go to AA regularly, she isolated herself.  (*Id.*)  She had difficulty sleeping, and slept five to six hours a night.  (*Id.*)  She occasionally felt worthless and had thoughts of wishing she were dead, but she denied suicidality.  (*Id.*)  She reported recent visions of someone standing near her and hearing background noises of people around her since December 2005.  (*Id.*)  When asked about manic episodes, she reported times where she cleaned excessively or spent excessive amounts of money shopping.  (*Id.*)

On mental status examination, Plaintiff was alert and oriented and scored 26/30 on the Folstein Mini-Mental Status Examination.  (*Id.*)  Her speech was articulate, but she exhibited lengthy response latencies.  (*Id.*)  Her mood was

variable, and she put forth reasonable effort on the tests.  (*Id.*)  Testing revealed

the following:  average intellect, with a full scale IQ of 99; good visual acuity with

average to superior visual-spatial functioning; low average motor speed and fine

dexterity of the right hand, moderately impaired on the left hand; performed

extremely well on testing of receptive and expressive language; attention and

concentration were average to high average; processing speed average;

performed extremely well on memory testing; good ability to learn; variable

performance on measures of problem solving and reasoning; reading and

spelling commensurate with intellectual functioning; arithmetic skills at low end of

low average range, suggesting an arithmetic learning disorder.  (Tr. 235-36.)

Plaintiff's MMPI-II results indicated she may have attempted to

overemphasize psychological difficulties, but not to a degree that would

invalidate her clinical scales.  (Tr. 236.)  Her clinical scales suggested a

personality type that "may use alcohol or drugs as a way of coping with stress"

and for which "diagnoses of depressive disorders, anxiety disorders, and

psychotic disorders all occur frequently."  (Tr. 236.)

Dr. Kearney opined that from a neuropsychological perspective, Plaintiff

could be gainfully employed.  (Tr. 237.)  However, he had some concerns that

her psychological status would place some limits on her.  (*Id.*)  He hoped she

would be able to maintain gainful employment with "a bit better symptom control."

(*Id.*)

Plaintiff went to therapy on September 20, 2006.  (Tr. 264.)  She remained sober, and Schmiedt assessed a GAF score of 59.  (*Id.*) The next month, Schmiedt noted Plaintiff was off Risperdal and starting Zyprexa.  (Tr. 263.) Schmiedt's assessment of Plaintiff's functioning was "tired, low mood, struggling with sobriety and her mood.  GAF 50."  (*Id.*)

In her next therapy session at the end of October, Plaintiff reported that Zyprexa was helping a great deal, and that she had the energy to paint her kitchen and spend time with others.  (Tr. 314.)  Although Plaintiff thought she might be "overenergized," she did not feel manic because she could focus and rest.  (*Id.*)  At her following visit, Plaintiff told Schmiedt that Zyprexa was helping her sleep, energy and focus.  (Tr. 313.)  Plaintiff shared a newsletter she was working on, and reported she was going to chair an AA group.  (*Id.*)  She was seeing her sponsor weekly and talking to her daily.  (*Id.*)  Schmiedt assessed a GAF score of 55.  (*Id.*)

On November 16, 2006, Dr. Dan Larson completed a Psychiatric Review Technique form and a Mental Residual Functional Capacity form regarding Plaintiff at the request of the Social Security Administration.  (Tr. 276-93.)  Dr. Larson opined that Plaintiff had medical impairments under Listings 12.04 Affective Disorders, 12.06 Anxiety-related Disorders, and 12.09 Substance Addiction Disorders.  (Tr. 276.)  Under the "B Criteria" of the listings, Dr. Larson opined that Plaintiff would have mild restrictions in activities of daily living; and moderate difficulties in maintaining social functioning and maintaining

concentration, persistence or pace.  (Tr. 286.)  He did not find any evidence of the "C criteria" of the listing.  (Tr. 287.)

Dr. Larson opined that Plaintiff would be moderately limited in the following mental activities:  the ability to understand, remember and carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to work in coordination with or proximity to others without being distracted by them; and the ability to interact appropriately with the general public.  (Tr. 290-91.)  Dr. Larson did not find Plaintiff to be significantly limited in any other mental activity.  (*Id.*)  He opined that she had the ability to do the following:  concentrate on, understand, and remember routine, repetitive, 3-4 step and limited-detailed instructions and tasks with adequate persistence and pace; brief and superficial contact with co-workers and the public; handle supervision with reasonably supportive supervisory styles that could be expected to be found in many customary work settings; and tolerate the routine stresses of a routine, repetitive, 3-4 step or limited detail work setting.  (Tr. 292.)  Dr. Larson's opinion was affirmed by Dr. R. Owen Nelson on February 23, 2007.  (Tr. 380-82).

In therapy on November 28, 2006, Plaintiff reported that she needed to return to work.  (Tr. 312.)  Schmiedt encouraged Plaintiff to wait six months before "adding employment to the mix."  (*Id.*)  Schmiedt assessed a GAF score of 55.  (*Id.*)

Plaintiff underwent a psychiatric evaluation with Dr. Steven Hahn at St. Cloud Hospital on December 13, 2006.  (Tr. 305-07.)  Dr. Hahn noted that Plaintiff had past psychiatric hospitalizations in 1981, 1994, 1998, 1999, and November 2004.  (Tr. 306.)  Her last chemical dependency treatment was in October 2004.  (*Id.*)  At the time of the evaluation, Plaintiff was involved in AA and had a sponsor.  (*Id.*)  Her last alcoholic drink was on October 13, 2006.  (*Id.*)

On mental status examination, Plaintiff appeared very tired, with a restricted affect and dysphoric[4] mood.  (Tr. 307.)  Her thought process was a little slow, and she denied visual hallucinations and delusions.  (*Id.*)  Dr. Hahn diagnosed major depression, alcohol dependence with recent relapse, and history of seasonal affective disorder.  (*Id.*)  He assessed a GAF score of 40 to 50.  (*Id.*)  He took Plaintiff off Zyprexa and started trials of Abilify and Lunesta. (*Id.*)

Nurse Carner at Northern Pines Mental Health Center completed a Psychological Medical Report form regarding Plaintiff on January 16, 2007.  (Tr. 337-39.)  She noted that she saw Plaintiff three or four times a month beginning July 22, 2005 through December 27, 2006. (Tr. 337.)  Nurse Carner said that it took Plaintiff a lot of energy to maintain her routine and a lot of support to maintain sobriety.  (*Id.*)  She also noted that Plaintiff's roommate encouraged Plaintiff to care for herself.  (*Id.*)  When left alone, Plaintiff tended to isolate.  (*Id.*)

---

4        Dysphoria is a mood of general dissatisfaction, restlessness, depression, and anxiety; a feeling of unpleasantness or discomfort.  *Stedman's Medical Dictionary* ("*Stedman's*") 554 (27th ed. 2000).

Plaintiff was anxious in social settings but comfortable around people she knew from AA.  (*Id.*)  In a typical day, Plaintiff followed a daily routine sheet that included AA readings, appointments with her probation officer, hygiene, housekeeping, and AA projects focusing on recovery.  (*Id.*)  Her interests were AA and caring for her two cats.  (*Id.*)

Nurse Carner noted that Plaintiff's depression and anxiety fluctuated, and it was difficult to find the right medications with limited medical coverage.  (Tr. 339.)  She opined that depression and anxiety limited Plaintiff in social situations.  (*Id.*)  She also opined Plaintiff would probably not start a task if her depression and anxiety were high, but she could complete routine tasks when they were lower.  (*Id.*)  With respect to Plaintiff's ability to follow instructions and complete tasks, Carner opined that Plaintiff could comprehend and follow most instructions but did not always follow through, and her ability was affected by her level of depression and anxiety.[5]  (Tr. 339.)

In therapy on January 2, 2007, Schmiedt noted that Plaintiff became over-focused or overzealous about a project and neglected other parts of her life, which led to relapse in the past.  (Tr. 367.)  Plaintiff had a new goal to manage her energy and emotional balance.  (*Id.*)  Schmiedt noted Plaintiff looked good

---

[5]   There is a handwritten statement between the two pages of the Medical Report, likely written by Carner, that "[r]ecipient would be able to do some part time work, which would be low stress.   Currently doing some (volunteer) work with AA group, writing up pamphlets for their District."  (Tr. 338.)

that day and had begun working out five days a week with an exercise buddy. (*Id.*)  She assessed a GAF score of 55.  (*Id.*)

On January 23, 2007, Plaintiff saw Dr. Hahn and reported that she wasn't sure whether Abilify was helping and that Lunesta did not help her sleep.  (Tr. 385-86.)  She was feeling worse, and attributed her feelings to the effects of winter.  (Tr. 386.)  Objectively, Plaintiff appeared less dysphoric than on her last visit, but her thought process continued to be a little slow.  (*Id.*)  She had no hallucinations or delusions.  (*Id.*)  Dr. Hahn increased Plaintiff's Effexor and started a trial of Sonata.  (*Id.*)

At the end of January, Plaintiff was anxious about a court hearing for violating probation, but otherwise she was doing "quite well." (Tr. 378.)  Schmiedt assessed a GAF score of 56.  (*Id.*)  Two weeks later, Plaintiff had moved in with some friends, was maintaining sobriety, going to AA meetings, and exercising daily.  (Tr. 377.)  She was less anxious than during the last session, and Schmiedt assessed a GAF score of 60.  (*Id.*)

On February 27, 2007, Plaintiff reported to Dr. Hahn that her depression had improved with an increase in Effexor and her sleep had improved with Sonata.  (Tr. 383-84.)  Objectively, Plaintiff had positive eye contact, slightly decreased speech, and slightly dysphoric mood and was otherwise normal.  (Tr. 383.)  Dr. Hahn diagnosed major depression, alcohol dependence, seasonal affective disorder and to rule out bipolar disorder.  (*Id.*)

Two months later, Plaintiff reported more anxiety and depressive symptoms. (Tr. 436.) Her stressors included moving to a new apartment without her cats and starting a new treatment program the next week. (*Id.*) On mental status examination, Plaintiff was slightly dysphoric with restricted affect, and her speech was slightly decreased in rate and volume. (*Id.*)

In therapy on June 5, 2007, Plaintiff reported she was in CD treatment for 28 days in May after relapsing twice. (Tr. 421.) When she returned home, she was lonely and isolated herself. (*Id.*) She was, however, attending aftercare once a week, and going to the drop-in center to see friends. (*Id.*) She was fearful about returning to AA and needing a sponsor. (*Id.*) Schmiedt's assessment of Plaintiff's functioning was "depressed, anxious, lonely, bored, disoriented (new home) and some paranoia." (*Id.*) She assessed a GAF score of 42. (*Id.*)

Plaintiff saw Dr. Hahn the next day and reported she continued to have alcohol cravings after treatment. (Tr. 435.) She became depressed in treatment and continued to be depressed, feeling overwhelmed and alone. (*Id.*) On mental status examination, Plaintiff had poor eye contact, decreased rate and volume of speech, but euthymic[6] mood with full affect. (Tr. 435-36.) Dr. Hahn increased Plaintiff's Effexor and started a trial of Ambien. (*Id.*)

---

[6]     Euthymia is moderation of mood, not manic or depressed. *Stedman's* at 627.

Three weeks later, Plaintiff reported she was isolating herself, and she gave her cat to her ex-roommate.  (Tr. 420.)  Plaintiff had plans to go camping over the weekend, but she was not positive about anything.  (*Id.*)  Her GAF score remained at 42.  (*Id.*)  At the following session in mid-July, Plaintiff reported she felt better after the camping trip.  (Tr. 419.)

The following week, Plaintiff was having difficulty sleeping.  (Tr. 418.)  She also reported using a relaxation technique to displace paranoid thoughts.  (*Id.*)  She had two neighbor friends, one with whom she went on walks daily.  (*Id.*)  They also played cards and had barbeques together.  (*Id.*)  Plaintiff looked less distressed, and Schmiedt assessed a GAF score of 50.  (*Id.*)

On July 25, 2007, Plaintiff was doing better with more social contact.  (Tr. 417.)  She had played games with her friends, walked with her neighbors, and went to birthday parties.  (*Id.*)  Schmiedt assessed a GAF score of 54.  (*Id.*)

Plaintiff saw Dr. Hahn a few days later and reported that her depression had improved with increased Effexor.  (Tr. 434.)  She also felt her alcohol cravings had diminished, so she did not need Campral.  (*Id.*)  Ambien had been helpful for her sleep problems.  (*Id.*)  Findings on mental status examination included slightly decreased volume and rate of speech and euthymic mood with slightly restricted affect.  (*Id.*)

The next week, Plaintiff's depression was at a level of four out of ten.  (Tr. 416.)  She had some challenges on a recent camping trip, but she was more open and upbeat.  (*Id.*)  She continued to socialize with neighbors and go to

aftercare.  (*Id.*)  She was planning fishing trips for the future.  (*Id.*)  Schmiedt opined Plaintiff would benefit from a volunteer position for a few hours a week. (*Id.*)  She assessed a GAF score of 57.  (*Id.*)

In August 2007, Plaintiff reported that her mood was improving, but expressed that she was sad, discouraged, and disappointed.  (Tr. 415.)  Her affect was flat, and when alone, her self-worth was low.  (*Id.*)  She reported a high fear of losing control, and she isolated herself when anxious.  (*Id.*)  She felt better when she was with people, and her sleep and appetite had moderated. (*Id.*)  Her energy was improved and she was walking with her neighbor twice a day, and going to AA twice a week.  (*Id.*)  Schmiedt assessed a GAF score of 57. (*Id.*)

In September, Schmiedt opined that Plaintiff's depression and anxiety had significantly reduced since June.  (Tr. 414.)  Plaintiff was serving house arrest that month, but she had friends from her building and AA who would drop by to watch a movie or visit.  (*Id.*)  Schmiedt assessed a GAF score of 60.  (*Id.*)

On September 25, 2007, Plaintiff reported relapsing two weeks earlier and going to jail for probation violation.  (Tr. 413.)  Since then, she felt less anxious and depressed, and attended AA twice a week.  (*Id.*)  Plaintiff was positive and optimistic, and Schmiedt assessed a GAF score of 63.[7]  (*Id.*)  The next week,

---

[7]     A GAF score of 61-70 indicates mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well.  DSM-IV-TR at 34.

Plaintiff continued to be positive, with only mild low mood. (Tr. 412.) She had reconnected with her family. (*Id.*)

Plaintiff saw Dr. Hahn the next week and requested to go back on Effexor due to side effects with her current antidepressant. (Tr. 433.) Plaintiff reported her relapse with alcohol, and Dr. Hahn recommended a trial of Campral.[8] (*Id.*) Plaintiff also reported feeling significantly down on days when there wasn't enough sun. (*Id.*) Dr. Hahn recommended that Plaintiff try a Verilux light bulb. (*Id.*) Findings on mental status examination included slightly decreased rate and volume of speech, and dysphoric mood with restricted affect. (*Id.*)

On October 9, 2007, Plaintiff had started a new therapy at Caritas Mental Health Clinic that included massage, body work, and spiritual connection. (Tr. 411.) She was attending AA four times a week, and said she felt "pretty good." (*Id.*) At the end of the month, Plaintiff's mood declined. (Tr. 410.) She was isolated and felt overwhelmed. (*Id.*) She was bored with her routine of staying sober. (*Id.*) She wanted to look for a job, because she could not manage her debt. (*Id.*) Schmiedt recommended "very part time" or volunteer work and activity that would increase her self-confidence. (*Id.*)

Plaintiff saw Dr. Hahn on November 13, 2007 and reported a worsening in her symptoms of seasonal affective disorder in that she did not feel like getting out of bed and had low energy. (Tr. 431-32.) Plaintiff agreed to try light therapy.

---

[8]     Campral is indicated for the maintenance of abstinence from alcohol in patients with alcohol dependence who are abstinent at treatment initiation. Physician's Desk Reference 3428 (59th ed. 2005).

(Tr. 432.)  On mental status examination, Plaintiff's rate and volume of speech were slightly decreased, but otherwise examination was normal.  (*Id.*)  Dr. Hahn prescribed a light box for therapy.  (*Id.*)

At the end of November, Schmiedt noted Plaintiff's mood had declined further.  (Tr. 409.)  Plaintiff reported feeling angry and helpless.  (*Id.*)  Her only solution for her situation was that she wanted to work.  (*Id.*)  Several weeks later, she was doing better.  (*Id.*)  She had a new sponsor and was going to get a new kitten.  (*Id.*)

On January 22, 2008, Plaintiff's mood was positive and relaxed.  (Tr. 408.) She was attending AA three to four times a week, and was opening the drop-in center twice a week.  (Tr. 408.)  She had nearly completed community service. (*Id.*)  She also applied to do volunteer work at a convent.  (*Id.*)

Plaintiff saw Dr. Hahn on February 13, 2008, and reported that she was volunteering and doing relatively well.  (Tr. 430.)   She believed light box treatment was helping, because she did not have a significant downturn in symptoms over the winter.  (*Id.*)  She continued to have difficulty sleeping, which she felt like she had all her life.  (*Id.*)  She reported that she had a job offer from Walmart.  (*Id.*)  Her mental status examination was normal.  (*Id.*)

The next week, Plaintiff reported doing well and maintaining sobriety.  (Tr. 407.)  Schmiedt, however, noted that Plaintiff appeared somewhat manic.  (*Id.*) She noted Plaintiff tended to overload herself with commitments and then crash. (*Id.*)

On March 6, 2008, Plaintiff had a diagnostic assessment update at Caritas Mental Health Clinic.  (Tr. 391-93.)  Schmiedt reviewed Plaintiff's long history of significant depression, chemical dependence, relapse and impulsive behaviors.  (Tr. 391.)  She noted that Plaintiff tended to relapse with extreme upswings in her mood, with symptoms of great increased energy, restlessness, racing and rapidly shifting thoughts.  (*Id.*)  As for depression, Plaintiff's symptoms were sadness, empty mood, extreme hopelessness, guilt, worthlessness, and loss of interest in things she normally loved, most notably, her cats.  (*Id.*)  She would have difficulty concentrating, making decisions, doing self-care routines, and she would have a huge increase in sleep.  (*Id.*)

At the time of the assessment, Plaintiff was living alone but was close to one of her neighbors.  (*Id.*)  Plaintiff adopted a kitten, which was very therapeutic for her.  (*Id.*)  She went to AA three to seven times a week.  (*Id.*)  She volunteered at St. Francis Convent and was active in helping out as a secretary at the drop-in center.  (*Id.*)  Plaintiff was taking Ambien but said it was not helping a great deal.  (Tr. 392.)  She had six months sobriety, with her last relapse in September 2007.  (*Id.*)  Plaintiff had been staying busy in February and March, and she was animated and functional.  (*Id.*)

Schmiedt diagnosed bipolar I disorder, alcohol dependency, dependent personality disorder and a GAF score of 62.  (Tr. 393.)  She rated Plaintiff's following conditions or symptoms as mild:  depression, sleep disturbance, appetite disturbance, hopelessness, anxiety, mania, anger.  (Tr. 392.)  Plaintiff's

attention was distracted and her concentration was brief. (*Id.*) However the following were normal: motor activity, affect, mood, speech, memory, thought processes and thought content. (*Id.*)

Plaintiff saw Dr. Hahn on June 12, 2008, and reported doing relatively well. (Tr. 429.) She was volunteering at the drop-in center. (*Id.*) On mental status examination, the rate, volume and tone of her speech were normal; mood was euthymic with relatively full affect; no signs of formal thought disorder or hallucinations or delusions; and no suicidal or homicidal ideation. (*Id.*) By Plaintiff's report, her therapist diagnosed her as bipolar, and she had a hypomanic/manic episode in February. (*Id.*) Dr. Hahn noted he could increase Plaintiff's Abilify if she started to experience manic symptoms. (*Id.*)

On November 12, 2008, Dr. Hahn completed a mental capacity questionnaire regarding Plaintiff at the request of her attorney. (Tr. 422-28.) Schmiedt completed the same form on February 26. 2009. (Tr. 439-443.) In a "check the box" section of the form, Dr. Hahn did not check "not significantly limited" or "mildly limited" for any of the mental activities he rated. (Tr. 424-26.) The following is a comparison of how Dr. Hahn and Schmiedt rated Plaintiff for each mental activity.

- ability to carry out short and simple instructions: Schmiedt: not significantly limited, Hahn: moderately limited

- ability to interact appropriately with the general public: Schmiedt: not significantly limited, Hahn: moderately limited

• ability to ask simple questions or request assistance: Schmiedt: not significantly limited, Hahn: moderately limited

• ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness: Schmiedt: not significantly limited, Hahn: moderately limited

• ability to be aware of normal hazards and take appropriate precautions: Schmiedt: not significantly limited, Hahn: moderately limited

• ability to carry out detailed instructions: Schmiedt: mildly limited, Hahn: markedly limited

• ability to sustain an ordinary routine without special supervision: Schmiedt: mildly limited, Hahn: moderately limited

• ability to work in coordination with or proximity to others without being unduly distracted by them: Schmiedt: mildly limited, Hahn: markedly limited

• ability to make simple work-related decisions: Schmiedt: mildly limited, Hahn: moderately limited;

• ability to accept instructions and to respond appropriately to criticism from supervisors: Schmiedt: mildly limited, Hahn: markedly limited

• ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes: Schmiedt: mildly limited, Hahn: moderately limited

• ability to respond appropriately to changes in the work setting: Schmiedt: mildly limited, Hahn:  markedly limited

• ability to remember locations and work-like procedures: Schmiedt: moderately limited, Hahn: markedly limited

• ability to understand and remember very short and simple instructions: Schmiedt: moderately limited, Hahn: moderately limited

• ability to carry out detailed instructions:  Schmiedt:  mildly limited, Hahn: markedly limited

• ability to understand and remember detailed instructions: Schmiedt: moderately limited, Hahn: markedly limited

• ability to set realistic goals or to make plans independently of others: Schmiedt: moderately limited, Hahn: markedly limited

• ability to maintain attention and concentration for extended periods (the approximately 2-hour segments between arrival and first break, lunch, second break and departure): Schmiedt: markedly limited, Hahn: markedly limited

• ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances: Schmiedt: markedly limited, Hahn: moderately limited

• ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods: Schmiedt: markedly limited, Hahn: markedly limited

• ability to travel in unfamiliar places or to use public transportation: Schmiedt: markedly limited, Hahn: markedly limited.

(Tr. 424-26, 439-41).

Dr. Hahn opined that Plaintiff met the level of severity he indicated on the form since he first began seeing her in December 2006, and she likely had been at that level since prior to 1999.  (Tr. 426.) He also checked "yes" to two statements that would indicate Plaintiff met the "C criteria" of the listing for affective disorders.  (Tr. 428.)  *See* 20 C.F.R. § 404, Subpart P, Appendix 1, 12.04(C).

Schmiedt could not assess an onset date, but noted that Plaintiff had years of comorbid depression and alcoholism.  (Tr. 441.)  Like Dr. Hahn, Schmiedt checked "yes" to two statements that would indicate Plaintiff met the "C criteria" of the listing for affective disorders.  (Tr. 443.)  She also stated Plaintiff could

function sporadically in a limited capacity and with lots of supervision when her mental illness was not in full force, which was not often.  (*Id.*)

## III.    Testimony at the Administrative Hearing

### Plaintiff's Testimony

At the hearing, Plaintiff gave the following testimony.  She was divorced and lived alone in an apartment at the time of the hearing.  (Tr. 23.)  She is a high school graduate.  (Tr. 24.)  She does not have a driver's license because it was revoked in 2003 for DWI.  (*Id.*)  She is disabled by depression, bipolar disorder and anxiety.  (*Id.*)

Plaintiff does not sleep well at night, but her appetite is fair.  (Tr. 25.)  Most days she can take care of her apartment.  (Tr. 25-26.)  Her neighbor cooks for her frequently.  (Tr. 26.)  She said she probably would not eat "unless it's practically put in front of me."  (Tr. 32-33.)  Her neighbor also motivates her to go out walking.  (Tr. 33.)  Without encouragement, she would not leave her apartment.  (*Id.*)  She attends AA two or three times a week and was sober since September 7, 2007.  (Tr. 26-27.)

Plaintiff watches television about four hours a day.  (Tr. 27.)  She has two friends whom she sees at the drop-in center, where she goes twice a week.  (Tr. 27-28.)  She attends peer support groups at the drop-in center.  (Tr. 28.)  Plaintiff does not go to movies or do much outdoors.  (Tr. 28.)  She volunteers at the drop-in center by opening it up and answering phones once a week, and the shift lasts three hours.  (Tr. 29, 34-35.) Twice, Plaintiff did not show up when she was

supposed to, other times she found a replacement. (Tr. 35.) She did not go if she did not feel like facing anyone. (Tr. 36.)

Plaintiff has problems remembering things. (Tr. 30.) She gets along with people reasonably well. (*Id.*) Sometimes she has difficulty with crowds of people. (Tr. 30-31.) Plaintiff has hearing aids that work if she is facing the person. (Tr. 31.)

Plaintiff has an "ARMHS worker,"[9] Leann Ward. (Tr. 33.) Her ARMHS worker helps her with transportation, setting goals, and keeps her from isolating. (Tr. 33-34.) Plaintiff sees Ward once or twice a week. (Tr. 34.) Plaintiff's only hobby is to go on the Internet, which she would do for two or three hours at a time but not every day. (Tr. 36.) She used to do puzzles, drawing and crocheting but gave up for lack of interest. (*Id.*)

On three or four weekends per month, Plaintiff does not answer her phone or her door because she does not want to talk to anyone. (Tr. 36-37.) Once in a while, she isolates herself during the week. (Tr. 37.)

Plaintiff was diagnosed as bipolar, and her last episode of high energy was the month prior to the hearing. (Tr. 38.) When this happens, she does not sleep. (*Id.*) She cleans her apartment at least once a week. (Tr. 38-39.) Her neighbor will sometimes bring her food and wash her dishes. (Tr. 39.) She does her laundry once a month. (*Id.*)

---

[9] ARMHS stands for Adult Rehabilitative Mental Health Services. http://www.dhs.state.mn.us/main/idcplg?IdcService=GET_DYNAMIC_CONVERS ION&RevisionSelectionMethod=LatestReleased&dDocName=id_004956

Plaintiff testified that Dr. Hahn wrote her a prescription for a cat.  (Tr. 40.)  This was also recommended by Plaintiff's previous ARMHS worker, who thought it would motivate her to get up and take care of the cat and have some accountability.  (Tr. 40-41.)

### Testimony of Leann Marie Ward

Ward testified that she is an ARMHS worker, and worked with Plaintiff since February 2008.  (Tr. 42.)  Her job is to keep Plaintiff on track, motivate her, set goals and monitor her symptoms.  (Tr. 42-43.)  She makes sure Plaintiff goes out and keeps her appointments.  (*Id.*)  On many days, especially with less sun, Plaintiff did not leave the house.  (Tr. 43.)  Ward testified that Plaintiff did not shower or get dressed every day, but she was a very tidy person and immaculate in taking care of her house.  (Tr. 43-44.)  Ward did not have to remind Plaintiff to take her medications.  (Tr. 44.)  Ward had not witnessed Plaintiff's episodes of excess energy, but Plaintiff reported episodes of not sleeping to her.  (Tr. 45.)

### Medical Expert Testimony

Dr. Michael Lace testified as a medical expert at the hearing.  (Tr. 46.)  He testified that Plaintiff had severe impairments of depression, bipolar disorder, dependent personality disorder and alcohol dependency under Listings 12.04, 12.08 and 12.09 respectively.  (Tr. 46-47.)  Dr. Lace agreed that Plaintiff's alcohol dependency was in early remission, but noted that it was "pretty steadily described as ongoing."  (Tr. 47.)

Dr. Lace then opined as to the severity of Plaintiff's mental impairments as described under the "B criteria" of the listings.  (Tr. 47-48.) Under Listing 12.09 for substance abuse disorders, he opined that Plaintiff would be moderately restricted in activities of daily living; markedly restricted in maintaining social functioning; and markedly impaired in maintaining concentration, persistence or pace, with no episodes of decompensation.  (Tr. 47.)  When he considered Listings 12.04 and 12.08 without considering Plaintiff's alcohol dependence, Dr. Lace opined she would be mildly restricted in activities of daily living; moderately restricted in maintaining social functioning; and moderately impaired in maintaining concentration, persistence or pace, with no episodes of decompensation.  (Tr. 47-48.)  He opined that the record did not support the "C criteria" of a Listing.  (Tr. 49.)  Dr. Lace noted that Plaintiff's GAF scores were generally between 50-60, with a score of 62 in March 2008, despite the diagnosis of bipolar I disorder, a fairly severe disorder.  (Tr. 48.)

Dr. Lace opined that Plaintiff would have the following work restrictions: brief and superficial contact with coworkers, the general public and supervisors; routine and repetitive tasks due to depression making it difficult for her to concentrate; and unskilled work.  (*Id.*)

### Vocational Expert Testimony

Wayne Onken testified at the administrative hearing as a vocational expert. (Tr. 50.)  The ALJ asked Onken a hypothetical question regarding whether a person with the work restrictions described by Dr. Lace could perform Plaintiff's

past relevant work.  (*Id.*)  Onken testified that such a person could perform

Plaintiff's past relevant unskilled work as a sandwich maker.  (*Id.*)  Onken

testified the permitted absenteeism in the job would be twice per month.  (Tr. 50-

51.)

## IV.    The ALJ's Decision and Findings

On February 6, 2009, the ALJ issued a decision concluding that Plaintiff

was not under a disability as defined by the Social Security Act at any time from

the alleged onset date through the date of the decision, therefore denying

Plaintiff's applications for disability insurance benefits and supplemental security

income.  (Tr. 7-18.)  The ALJ followed the five-step procedure as set out in the

Code of Federal Regulations.  *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).[10]

The ALJ also noted that if there is evidence of a substance use disorder and the

claimant was found disabled when the substance abuse was considered, there is

an additional issue as to whether the substance use disorder is a contributing

factor material to the determination of disability.  (Tr. 12.)  *See* 20 C.F.R. §§

---

[10]    The Eighth Circuit Court of Appeals has summarized the five-step
procedure as follows:  (1) whether the claimant is currently engaged in
"substantial gainful activity"; (2) whether the claimant suffers from a severe
impairment that "significantly limits the claimant's physical or mental ability to
perform basic work activities"; (3) whether the claimant's impairment "meets or
equals a presumptively disabling impairment listed in the regulations (if so, the
claimant is disabled without regard to age, education and work experience)";
(4) "whether the claimant has the residual functional capacity ["RFC"] to perform
his or her past relevant work"; and (5) if the ALJ finds that the claimant is unable
to perform his or her past relevant work then the burden is on the Commissioner
"to prove that there are other jobs in the national economy that the claimant can
perform."  *Fines v. Apfel*, 149 F.3d 893, 894-95 (8th Cir. 1998).

404.1535, 416.935.  To make this determination, the ALJ must evaluate the

extent to which the claimant's impairments would remain if the claimant stopped

the substance abuse.  (Tr. 12.)  If the remaining limitations would not be

disabling, substance use disorder is a contributing factor material to disability,

and the claimant is not disabled.  (*Id.*)

The ALJ found that Plaintiff had not engaged in substantial gainful activity

since her alleged onset date of July 13, 2006, therefore meeting the requirement

at the first step of the disability determination procedure.  (Tr. 13.)  At step two,

the ALJ found that Plaintiff had severe impairments of affective disorder,

dependent personality disorder, and substance abuse disorder.  (*Id.*)

At step three, the ALJ found that Plaintiff's impairments, including

substance use disorder, met Listing 12.05, based on Dr. Lace's testimony.  (Tr.

14.)  This Court assumes that the ALJ mistakenly cited Listing 12.05, instead of

12.09, because Dr. Lace testified that Plaintiff met listing 12.09, substance use

disorder, and there was no evidence that Plaintiff had any elements of the mental

retardation listing 12.05.  (Tr. 47.)

In support of his determination, the ALJ cited the following.  Plaintiff is

credible regarding the symptoms and limitations related to her long history of

substance use.  (Tr. 14.)  The ALJ noted that Dr. Kearney found solid cognitive

skills and nothing to suggest neurocognitive deficits, in contrast to the marked

limitations in memory and cognition suggested by Dr. Hahn.  (*Id.*)  The ALJ also

noted that Plaintiff's personality test results suggested she was overemphasizing

her psychological difficulties.  (Tr. 14-15.)  The ALJ found Dr. Hahn's opinion

inconsistent with Plaintiff's volunteer work, and Plaintiff's many social activities

and Schmiedt's treatment records.  (Tr. 15.)  He also noted that in 2005,

Schmiedt wrote that Plaintiff would probably not be able to hold a job, but in

November 2006, she opined that Plaintiff would be employable in six months.

(*Id.*)

The ALJ noted Dr. Hahn's assessment was fairly consistent with the

medical expert's testimony in the context of alcohol abuse, and noted that Dr.

Hahn did not offer an assessment of Plaintiff's limitations if alcohol abuse were

not considered.  (*Id.*)  Ultimately, the ALJ relied upon Dr. Lace's testimony and

the opinions of the state agency reviewers, that Plaintiff had comparatively minor

limitations when abstinent from alcohol.  (*Id.*)

Next, the ALJ determined that if Plaintiff stopped the substance abuse, she

would still have a severe impairment or combination of impairments.  (*Id.*)  The

ALJ concurred with the medical expert's testimony in this regard, although he

noted claimant had a considerable capacity to get along with others as evidenced

by her volunteer work.  (*Id.*)  The ALJ also relied on the ME's and state agency

consultants' opinions that if Plaintiff stopped substance abuse, she would not

meet or equal a listed impairment.  (*Id.*)  The ALJ noted that Plaintiff's treating

sources did not offer an assessment of Plaintiff's limitations absent substance

abuse.  (*Id.*)  The ALJ further stated:

> In making this finding, the claimant's extensive personal and social activities, unpaid work activity, and her indication that she was waiting for her legal entanglements to resolve before looking for work are also take into account.  Clearly, the fact that she has been able to act as a chairperson, secretary, and co-facilitator when not engaging in substance abuse and Dr. Kearney's findings of no cognitive limitations at all would indicate no marked limitations in either social functioning or concentration, persistence, and pace absent the material element of substance abuse.

(Tr. 16.)

The ALJ determined that if Plaintiff stopped the substance use, she had the capacity to perform a full range of work at all exertional levels but with the following nonexertional impairments:  she could perform simple, routine, repetitive, unskilled work, which would not require more than brief or superficial contact with others.  (*Id.*)  The ALJ's reasons were as follows.  First, Plaintiff did volunteer work, was very active with her family and friends, engaged in social activities including camping, fishing, regular barbeques, gaming and attending parties.  (Tr. 17.)  Second, Plaintiff received unemployment benefits, and the receipt of such benefits requires an affirmation that the recipient is ready, willing, and able to work.  (*Id.*)  The ALJ further noted that Plaintiff was offered a job at Walmart, but on another occasion stated that she was waiting for the end of her house arrest and legal difficulties to resolve before looking for work.[11]  (*Id.*)  The ALJ noted that Plaintiff was in remission at the time of the hearing, and she was quite functional absent the abuse.  (*Id.*)

---

[11]     The ALJ did not cite where in the record he found Plaintiff's statement about waiting to get a job.  The ALJ may have been referring to Plaintiff's treatment goal in July 2008, to "survive probation, than get a job."  (Tr. 397.)

Then, the ALJ considered Plaintiff's credibility.  (Tr. 17.)  He stated:

As for the opinion evidence, Dr. Hahn's assessments of marked limitations precluding work activity and Ms. Schmiedt's statement that the claimant would be unable to hold a job are discounted in view of the extent of the claimant's activities, including work-like activity, and level of daily functioning and social engagements.

(*Id.*)  However, he also discounted the opinions of Dr. Hahn and Schmiedt because he believed that they did not assess Plaintiff's limitations in the absence of substance abuse.  (*Id.*)

At step four of the disability determination procedure, the ALJ found, based on the VE's testimony, that Plaintiff could perform her past relevant work as a sandwich maker.  (Tr. 18.)  The ALJ also considered that Plaintiff was gainfully employed for over a decade until 2000 and intermittently after that.  (*Id.*)  The ALJ stated, "the claimant's treatment records tacitly concede that her difficulties with maintaining a regular work schedule at the current time are largely related to her house arrest and other legal problems rather than an actual total inability to work."  (*Id.*)  Thus, Plaintiff was not disabled within the meaning of the Social Security Act at any time from the alleged onset date through the date of the decision.  (*Id.*)

## DISCUSSION

This case presents the very difficult task of separating Plaintiff's alcohol dependence from her mental health issues.  The question is whether the ALJ adequately did so in determining that absent her substance use, Plaintiff would be capable of substantial gainful employment.

## I.      Standard of Review

Congress has prescribed the standards by which Social Security disability benefits may be awarded.  "Disability" under the Social Security Act means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).

Review by this Court of the Commissioner's decision to deny disability benefits to a claimant is limited to a determination of whether the decision of the Commissioner is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); *Baker v. Barnhart*, 457 F.3d 882, 892 (8th Cir. 2006).  "There is a notable difference between 'substantial evidence' and 'substantial evidence on the record as whole.'"  *Gavin v. Heckler*, 811 F.2d 1195, 1199 (8th Cir. 1987) (quotation omitted).  Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quotations omitted); *see also Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir.

2001) (quoting *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998)).

"'Substantial evidence on the record as a whole,' . . . requires a more scrutinizing

analysis." *Gavin*, 811 F.2d at 1199.  "The substantial evidence test employed in

reviewing administrative findings is more than a mere search of the record for

evidence supporting the [Commissioner's] findings." *Id.*  In reviewing the

administrative decision, "'[t]he substantiality of the evidence must take into

account whatever in the record fairly detracts from its weight.'" *Id.* (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)).

    In reviewing the record for substantial evidence, the Court may not

substitute its own opinion for that of the ALJ.  *Woolf v. Shalala*, 3 F.3d 1210,

1213 (8th Cir. 1993).  This Court may not reverse the Commissioner's decision

merely because evidence may exist to support the opposite conclusion.  *Mitchell

v. Shalala*, 25 F.3d 712, 714 (8th Cir. 1994); *see also Woolf*, 3 F.3d at 1213

(concluding that the ALJ's determination must be affirmed, even if substantial

evidence would support the opposite finding).  The possibility that the Court could

draw two inconsistent conclusions from the same record does not prevent a

particular finding from being supported by substantial evidence.  *Culbertson v.

Shalala*, 30 F.3d 934, 939 (8th Cir. 1994).

    The claimant bears the burden of proving his or her entitlement to disability

insurance benefits under the Social Security Act.  *See* 20 C.F.R. § 404.1512(a);

*Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000); *Thomas v. Sullivan*, 928

F.2d 255, 260 (8th Cir. 1991).  Once the claimant has demonstrated that he or

she cannot perform past work due to a disability, "the burden shifts to the

Commissioner to prove, first that the claimant retains the residual functional

capacity to do other kinds of work, and, second that other work exists in

substantial numbers in the national economy that the claimant is able to do."

*Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000).

## II.     Analysis of the ALJ's Decision

Plaintiff raises three issues for review.  She argues that the ALJ erred:  (1)

in assessing whether alcohol abuse was a material factor in her disability; (2) in

assessing whether she met listing 12.04(c); and (3) in assessing her ability to

perform a normal work week. (Pl.'s Mem. at 5-9.)

First, Plaintiff contends that the ALJ erred in assessing whether alcohol

abuse was a material factor in her disability.  To that effect, she argues that when

she was not using alcohol, she had increased symptoms of mental illness.

Plaintiff suggests there is a pattern in her medical records where "in the months

leading up to relapse" she had significant depression which slowly improved; and

at the time of relapse, she was positive, optimistic and euthymic; and after she

regained sobriety, her mood worsened.  (Pl.'s Mem. at 6.)  Plaintiff also suggests

that bipolar disorder can precipitate substance abuse.   Further, Plaintiff notes

that the ALJ mistakenly stated that her treating sources never opined that she

had severe disabling limitations independent of alcohol abuse.   Plaintiff also

contends the ALJ erred by adopting the medical expert's conclusory opinion that

abuse of alcohol was material to her disability.

Second, Plaintiff contends that absent alcohol abuse, she met Listing

12.04(C).  She argues the ALJ disregarded the opinions of the treating

physicians that "there was a residual disease process with marginal adjustment

such that a minimal increase in mental demands would be predicted to cause the

individual to decompensate." (*Id*. at 8.)   Plaintiff also contends that the

testimony of her ARMHS worker supports a finding that she needed psycho-

social support to function as well as she did, and that the ALJ did not discuss this

evidence.

Third, Plaintiff contends the ALJ should have credited both treating source

opinions that she is unable to complete a normal workday or workweek without

interruptions from psychological factors.  She concedes that some of her

activities require greater concentration or ability to get along with people than her

treating psychiatrist opined, but argues her activities do not suggest she can

engage in substantial gainful work activity.  Plaintiff further argues that the

inability to complete a normal workday or workweek is equivalent to missing work

every week, and the VE testified that such absenteeism would preclude

employment.

Defendant responds that substantial evidence in the record as a whole

supports the ALJ's finding that alcohol abuse was a material factor in disability.

Defendant argues that the evidence demonstrates Plaintiff to have a long history

of alcohol abuse, which continued during the relevant time period with

intermittent periods of sobriety. When Plaintiff was not drinking, Defendant argues, her condition improved.

Defendant notes that while the boilerplate language in the treating physicians' forms suggests that they addressed Plaintiff's limitations independent of alcohol abuse, the opinions expressed there about Plaintiff's limitations contradicted their own treatment notes and the evidence in the record as a whole.

Defendant also contends that substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 12.04(C), absent alcohol abuse. Defendant states that Plaintiff failed to establish that each of the criteria under listing 12.04(c) were met. Defendant also suggests that Plaintiff has not proffered specific evidence to challenge the ALJ's determination on this point.

Finally, Defendant argues that the ALJ reasonably determined that Plaintiff could complete a normal workday and workweek within the parameters of her residual functional capacity. Defendant contends the ALJ reasonably declined to grant significant weight to the treating sources' opinions because they were not supported by any objective evidence. To that effect, Defendant notes that Plaintiff engaged in volunteer work when sober and had no complaints requiring adjustments in her medication.

### A. Whether Alcohol Abuse is a Material Factor to Disability

"Since certain 1996 amendments to the Social Security Act, if alcohol or

drug abuse comprises a contributing factor material to the determination of disability, the claimant's application must be denied." *Brueggemann v. Barnhart*, 348 F.3d 689, 693 (8th Cir. 2003) (citing 42 U.S.C. § 423(d)(2)(C); 20 C.F.R. § 404.1535). "Under both 20 C.F.R. § 404.1535 (disability) and 20 C.F.R. § 416.935 (supplemental security income), the relevant inquiry is 'whether [the Commissioner] would still find you disabled if you stopped using drugs or alcohol.'" *Id.* (quoting *Estes v. Barnhart*, 275 F.3d 722, 724-25 (8th Cir. 2002). It is Plaintiff's burden to prove substance use disorders are not a contributing factor material to disability. *Id.*

> If the gross total of a claimant's limitations, including the effects of substance use disorders, suffices to show disability, then the ALJ must next consider which limitations would remain when the effects of the substance use disorders are absent. . . [W]hen the claimant is actively abusing alcohol or drugs, this determination will necessarily be hypothetical and therefore more difficult than the same task when the claimant has stopped. . . Even though the task is difficult, the ALJ must develop a full and fair record and support his conclusion with substantial evidence on this point. . .

*Id.* at 695-96 (internal citations omitted). However, if the ALJ cannot determine whether substance use disorders are a contributing factor material to the determination of disability, Plaintiff's burden is met; in other words, a tie goes to Plaintiff. *Id.*

Here, this Court finds that there is substantial evidence in the record as a whole to support the ALJ's finding that alcohol abuse was a material factor in

disability.   As discussed below, Plaintiff has a long history of alcohol abuse, which continued during the relevant time period with intermittent periods of sobriety.   However, the record evidence also demonstrates that when Plaintiff was not drinking, her condition improved, sometimes dramatically.

Plaintiff, who has a very long history of alcoholism and depression, continued to intermittently abuse alcohol during the relevant time period. Therefore, the ALJ had the difficult task of determining, in a hypothetical situation, whether Plaintiff would have been disabled absent alcohol abuse.  Both Plaintiff and Defendant cite periods of Plaintiff's sobriety in support of their contrary conclusions on whether alcohol abuse was a material factor in Plaintiff's disability.

In June 2006, just before Plaintiff was laid off her job, she relapsed with alcohol.  (Tr. 247.)  Her next relapse was in October 2006.  (Tr. 306.)  Between the relapses, in August 2006, nurse Carner and psychologist Brown rated Plaintiff as having moderate problems in the following areas:  mental health symptoms, mental health service needs, use of drugs or alcohol, vocational functioning, social functioning including use of leisure time, interpersonal functioning including relationships with the adult's family; self-care and independent living capacity.  (Tr. 343-44.)  Carner opined that Plaintiff's prognosis was good if she followed through with treatment and maintained sobriety.  (Tr. 340.)  Shortly after Plaintiff's October 13, 2006 relapse, Plaintiff

reported that she might be "overenergized" but not manic because she could focus and relax.  (Tr. 306, 314.)

Plaintiff was sober from November 2006 through April 2007.  (Tr. 421.) During this period of sobriety, in November 2006, Schmiedt encouraged Plaintiff to wait six months before considering returning to employment, and she assessed a GAF score of 55.  (Tr. 312.)  Plaintiff was first treated by Dr. Hahn in December 2006, and he noted she appeared very tired and dysphoric.  (Tr. 307.) He assessed a GAF score of 40-50.  (*Id.*)  In January, Schmiedt noted Plaintiff was exercising every day with a friend, and she assessed a GAF score of 55. (Tr. 367.)  In February 2007, Plaintiff's GAF score rose to 60, and she reported improvement.  (Tr. 377, 383.)  Plaintiff was under more stress in April because she was moving to a new apartment and could not take her cats, but Dr. Hahn described her as only "slightly dysphoric."  (Tr. 436.)

Plaintiff had a major relapse in May 2007, which landed her in jail and 28 days in treatment.  (Tr. 421.)  After treatment, she remained very depressed with a GAF score of 42 through mid-July, when she began slowly improving, up to a GAF score of 60 before her next relapse.  (Tr. 414-21, 434-36.)

Plaintiff relapsed again in September 2007.  (Tr. 413.)  This is also the month when she was on house arrest.  Plaintiff felt positive after her relapse, and her GAF score was 63 two weeks later.  (*Id.*)  Although Plaintiff had some increased depression with seasonal affective disorder after this relapse, she was much better in January 2008 and remained so through the end of the medical

records in June 2008, with GAF scores of 60 and above. (Tr. 392-93, 407-09, 411-12, 429, 431-33.)

Plaintiff's mental illness clearly did not disappear when she was sober, but, based on her GAF scores, it was rarely severe. Although there was some suggestion by Dr. Gunn that Plaintiff relapsed due to manic episodes of bipolar disorder, this Court finds little evidence of such episodes during the relevant time period. In February 2008, Schmiedt opined that Plaintiff appeared somewhat manic. (Tr. 407.) However, there is no evidence of a relapse during a manic episode in the medical records.

There was also a suggestion by Dr. Gunn that Plaintiff's June 2006 relapse was caused by her having hallucinations of shadows and hearing people talking. (Tr. 247.) Plaintiff never reported any hallucinations after this,[12] nor was there any evidence of what caused her later relapses. The record contains evidence of Plaintiff struggling with alcohol cravings (Tr. 342, 345, 433, 435), but there is no indication during the relevant time period that an independent mental illness caused the alcohol cravings.

Plaintiff's longest period of sobriety was nine months from October 2007 through June 2008. Although Plaintiff suffered from seasonal affective disorder in November 2007, and did not improve dramatically before January 2008, she then experienced her highest level of functioning. (Tr. 392-93, 407-09, 430-32,

---

[12] All of the mental status examinations performed by Dr. Hahn indicated Plaintiff denied hallucinations and delusions. (Tr. 307, 383, 386, 429, 430, 432, 433, 434, 436.)

429.) It is not known whether Plaintiff continued to do well, because the medical record ends in June 2008. Most of Plaintiff's volunteer activities that the ALJ found inconsistent with disability occurred during this time period. (*Id.*) Plaintiff's GAF score was never below 60 from January 2008 through June 2008, indicating only mild limitations in functioning based on mental illness during this period of sobriety. (*Id.*)

In addition to this evidence, the ALJ also relied on Dr. Kearney's neuropsychological examination, which Plaintiff underwent during a period of sobriety, and scored very well.[13] (Tr. 233-38.) These test results were inconsistent with Plaintiff's treating physicians' opinions relating to her mental activities restrictions. While Plaintiff's MMPI-II results indicated that she is a type of person likely to abuse substances and be diagnosed with depressive disorders, anxiety disorders, and psychotic disorders, Dr. Kearney noted that Plaintiff may have overemphasized her psychological difficulties. (Tr. 236.) He also opined that from neuropsychological perspective, Plaintiff could engage in substantial gainful activity "with a bit better symptom control." (Tr. 237.)

---

[13] In summary, Plaintiff's neurocognitive tests results indicated: average intellect, with a full scale IQ of 99; good visual acuity with average to superior visual-spatial functioning; performed extremely well on testing of receptive and expressive language; attention and concentration were average to high average; processing speed average; performed extremely well on memory testing; good ability to learn; variable performance on measures of problem solving and reasoning; reading and spelling commensurate with intellectual functioning. (Tr. 235-36.) Plaintiff scored only low average in arithmetic. (Tr. 236.)

And Plaintiff did in fact achieve better symptom control during the relevant time period.  Plaintiff's depression, in part caused by seasonal affective disorder, came under control during a period of sobriety and treatment with light therapy from January 2008 through June 2008. (Tr. 392-93, 407-09, 430-32, 429.) Plaintiff's volunteer activities during this period are quite consistent with Dr. Lace's opinion that Plaintiff was only mildly restricted in daily activities, and moderately restricted in social functioning and maintaining concentration, persistence and pace.  In sum, because the ALJ's determination that alcohol abuse was a material factor to Plaintiff's disability is supported by substantial evidence in the record as a whole, the ALJ's opinion should be affirmed.[14]

*Culbertson*, 30 F.3d at 939.

---

[14]     This Court notes that the ALJ's statement that Dr. Hahn and Schmiedt did not evaluate Plaintiff's mental limitations in the absence of alcohol abuse was likely incorrect.  The evaluation form contains boilerplate language directing the evaluators not to consider the effects of alcohol abuse in rating the severity of Plaintiff's mental impairments.  Thus, assuming Dr. Hahn and Schmiedt reviewed and followed those instructions, their opinions addressed Plaintiff's mental limitations without considering the effect of her alcohol abuse.  However, the ALJ's apparent mistake does not change this Court's analysis because, as discussed above, the ALJ was nonetheless justified in rejecting the opinions of the treating physicians because they were inconsistent with Dr. Kearney's neurocognitive evaluation, and with Plaintiff's level of daily functioning, volunteer work and social activities.  (Tr. 14-17.)  Thus, to the extent the ALJ made a factual error, it was harmless because he would have reached the same decision even absent the mistake.  *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003) (applying harmless error analysis and noting that the standard is "whether the ALJ would have reached the same decision denying benefits even absent the error"); *Schneiders v. Barnhart*, No. C05-4092, 2006 WL 559247, *13 (N.D. Iowa Mar. 7, 2006) (stating that the ALJ's mistaken assessment of plaintiff's ability to tolerate various pollutants was harmless because none of the relevant jobs

**B.     Listing 12.04(C)**

The medical expert and the agency consulting physicians found Plaintiff to have an affective disorder under Listing 12.04(A).  (Tr. 276, 380-82.)  To meet or equal Listing 12.04, a claimant must prove that she meets the required severity level of both paragraphs A and B or the requirements of paragraph C.  20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04.  Plaintiff contends that she meets the requirements of paragraph C.  Dr. Hahn and Schmiedt checked boxes on a form under the heading "Effect of Increased Stress," to indicate they believed Plaintiff met the criteria of the introductory paragraph and subsection 2 of Listing 12.04(C), as defined below.  (Tr. 428, 443.)

Listing 12.04(C) requires evidence of:

> Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support and one of the following:
>
> 1.   Repeated episodes of decompensation, each of extended duration; or
>
> 2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3.   Current history of 1 or more years' inability to function outside a highly supportive living

discussed in the vocation expert's hypothetical involved exposure to those environmental conditions).

> arrangement, with an indication of continued need
> for such an arrangement.

20 C.F.R. § 404, Subpart P, Appendix 1, § 12.04(C).

The record as a whole clearly supports the tenuous nature of Plaintiff's sobriety and her need for a great deal of support in maintaining sobriety (*see e.g.* Tr. 337).  If alcohol abuse could be considered, Plaintiff would meet Listing 12.04(C).  But the relevant inquiry here is whether she would meet the listing *absent* alcohol abuse.

This Court agrees with Defendant that neither Dr. Hahn nor Schmiedt provided any basis for their conclusion that Plaintiff met the required Listing. Courts routinely uphold an ALJ's decision to discount a treating physician's MSS where the limitations listed on the form "stand alone," and were "never mentioned in [the physician's] numerous records or treatment" nor supported by "any objective testing or reasoning." *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005) (quoting *Hogan v. Apfel,* 239 F.3d 958, 961 (8th Cir.2001)).   Although Schmiedt checked a box indicating that "even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate," she also rated Plaintiff's ability to respond appropriately to changes in the work setting as only mildly limited.  (Tr. 441.)

Plaintiff argues, based on Ward's testimony, that she required social support to function as well as she did.  But Ward did not testify that without her support Plaintiff's affective disorder, absent alcohol abuse, would be expected to

47

decompensate under a minimal increase in mental demands or change in the
environment.  (Tr. 42-45.)  Notably, Plaintiff obtained a job offer from Walmart in
June 2008, which suggests Plaintiff believed she was ready to undertake
employment.  (Tr. 429.)

In summary, Plaintiff was able to maintain a good level of functioning
during a six-month period of sobriety from January 2008 through June 2008, with
only mild limitations in functioning, according to her GAF scores and Dr. Hahn's
progress notes.  With good control over her mood with light therapy and
medication, there is little to suggest she would decompensate under minimal
increase in stress or change in environment.  The ALJ noted that Plaintiff worked
for a ten-year period ending in 2000.  (Tr. 18.)  This suggests that Plaintiff, in the
long course of her mental illness, was able to maintain gainful employment for a
very significant period of time without losing her ability to work.  As such,
substantial evidence supports the ALJ's determination that Plaintiff did not meet
Listing 12.04(c).

### C.    Ability to Complete a Normal Workday and Workweek

Plaintiff contends the ALJ should have credited Dr. Hahn's and Schmiedt's
opinion that she is unable to complete a normal workday or workweek without
interruptions from psychological factors, and that the ALJ did not address this
issue.  The ability to complete a normal workday and workweek was only one
out of twenty activities rated by Dr. Hahn and Schmiedt.  The ALJ was not
required to address each rating separately, especially where no reasoning was

provided for the ratings. *See Black v. Apfel*, 143 F.3d 383, 386 (8th Cir. 1998) ("Although required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted.") It is sufficient that the ALJ generally addressed the treating source opinions provided on the forms.

The findings made by the ALJ in support of rejecting the treating source opinions also apply to the specific issue of completing a normal workday or workweek without interruptions from psychological factors. Dr. Kearney's neuropsychological report does not contain any findings that would suggest that Plaintiff would be mentally limited from performing a full day or week of employment. Plaintiff's volunteer activities during her six month period of sobriety from January 2008 through June 2008, while not full-time work activity, are also inconsistent with the inability to complete a normal workday or workweek without interruptions from psychological factors.

## RECOMMENDATION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED THAT**:

1. Plaintiff's Motion for Summary Judgment (Doc. No. 7), be **DENIED**; and

2. Defendant's Motion for Summary Judgment (Doc. No. 9), be **GRANTED**.

Date: June 20, 2011                    *s/ Jeffrey J. Keyes*
                                       JEFFREY J. KEYES
                                       United States Magistrate Judge


Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **July 4, 2011**, a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within **fourteen days** after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.